1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

7

8

9

10

11

12

13

14

| | |
|---|---|
| HELIUM FINANCIAL GROUP, LLC and HELIUM ADVISORS, LLC, <br><br>     Plaintiffs, <br><br> v. <br><br> ROSHAN WEERAMANTRY; CYRUS AMINI; OAKLEY PARTNERS, LLC; and HYPHEN WEALTH MANAGEMENT, LLC, <br><br>     Defendants. | No. <br><br> COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF <br><br> **JURY DEMAND** |

15

16

Helium Financial Group, LLC and Helium Advisors, LLC (collectively "**Plaintiffs**" or

"**Helium**"), allege as follows:

17

## I.    INTRODUCTION

18

19

20

21

22

23

24

Defendants Roshan Weeramantry and Cyrus Amini, former Helium employees, blatantly stole Helium's confidential and proprietary information and trade secrets and used it for their own benefit. In addition, Weeramantry and Amini shared Helium's confidential and proprietary information and trade secrets with Weeramantry's newly created competing companies, Hyphen Wealth Management, LLC and Oakley Partners, LLC (together with Weeramantry and Amini, collectively, "**Defendants**"). Hyphen Wealth Management, LLC and Oakley Partners, LLC used the information Weeramantry and Amini stole for Defendants' benefit and to Helium's detriment.

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 1
No.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Helium brings this action to redress Defendants' misappropriation and unlawful use of Helium's confidential, proprietary information and trade secrets, which these former employees unlawfully stole, to protect its right to fairly compete in the marketplace.

## II.    PARTIES AND JURISDICTION

1.      Helium Financial Group, LLC ("**Helium Financial**") is a Washington limited liability company located at 1910 120th Place SE, Suite 102, Everett, WA 98208.

2.      Helium Advisors, LLC ("**Helium Advisors**") is a Washington limited liability company doing business in Washington as Helium Advisors located at 1910 120th Place SE, Suite 102, Everett, WA 98208. Helium Advisors is a wholly-owned pass-through subsidiary of Helium Financial.

3.      Roshan Weeramantry ("**Weeramantry**") is Helium's former Senior Financial Advisor, Partner, and Co-Head of Wealth Management. Upon information and belief, Weeramantry is a resident of Alameda County, California.

4.      Cyrus Amini ("**Amini**") is Helium's former Chief Investment Officer. Upon information and belief, Amini is a resident of Charleston County, South Carolina.

5.      Oakley Partners, LLC ("**Oakley**") is a California limited liability company incorporated by Weeramantry. Upon information and belief, Weeramantry is Oakley's Managing Member.

6.      Hyphen Wealth Management, LLC ("**Hyphen**") is a California limited liability company. Upon information and belief, Weeramantry is Hyphen's Managing Member.

7.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs have claims for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(c). This Court has subject matter jurisdiction because Defendants reside in different states and have caused Helium to suffer more than $75,000 in

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 2
No.

damages. 28 U.S.C. § 1332.

8.    This Court has pendent or supplemental jurisdiction over Plaintiffs' remaining claims pursuant to 28 U.S.C. § 1367.

9.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because Defendants are subject to the personal jurisdiction of this Court. Helium Financial and Helium Advisors are Washington-based companies, Defendants initiated purposeful contact with Helium and its clients in the state of Washington, and Defendants' wrongful acts were directed at harming Helium Financial, Helium Advisors, and their Washington-based information and assets.

## III.    BACKGROUND FACTS

### A.    Helium's Business.

10.    Helium operates an SEC-registered investment advisory and wealth management firm headquartered in Everett, Washington. As a registered investment advisory and wealth management firm, Helium provides product expertise coupled with market knowledge to identify suitable investment products for its clientele and provides financial and strategic planning services to help its clients achieve their investment objectives.

11.    Helium began its operations in 2015 and grew its client base over the past decade with its investment advisory, financial planning, integrated tax planning and preparation, and wealth management programs and related service offerings. Throughout this period, Helium successfully established itself as a key player in the Pacific Northwest investment advisory marketplace and spent years of trial and error, research, and developing customers' trust to cultivate an impeccable reputation, allowing it to sustain that trust while seeking out and nurturing new strategic relationships. Helium now services clients throughout the United States.

12.    While Helium spends heavily on marketing and other outreach efforts, it develops the majority of its customer relationships and business through its reputation, namely by word of

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 3
No.

mouth among current clients and partners and outside professional centers of influence.

13.    In contrast, Hyphen is a new entity that was only incorporated in July 2025. Upon information and belief, Hyphen styles itself as an investment advisory and wealth management firm that delivers similar services in the same marketplace as Helium.

14.    Upon information and belief, Hyphen is a single member limited liability company formed in California by Weeramantry. It appears to operate as an investment advisory firm.

15.    Upon information and belief, Hyphen was registered/notice filed in California and South Carolina on September 3, 2025, and is currently under a 120-day Approval registration status by the Securities and Exchange Commission ("**SEC**")

16.    Upon information and belief, Oakley is Weeramantry's single member limited liability company formed in California in March 2022. Oakley is a member of Helium Financial Group, LLC owning 4.20% of existing shares.

17.    The investment and wealth management industry is closely regulated because firms and advisors are responsible for managing large amounts of client funds through a variety of regulated investment vehicles, such as securities. Helium and its employees are required to maintain a variety of registrations, licenses, and certifications, including, but not limited to those required or administered by the SEC and the Financial Industry Regulatory Authority ("**FINRA**"). Helium also must comply with a variety of reporting and certification renewal requirements, including regular reports to the same agencies, renewing its advisors' licenses, and certain events required under FINRA regulations.

18.    For example, FINRA Rule 4530 requires covered firms to report customer complaints, civil claims, and settlements over certain amounts, and compliance and internal disciplinary actions taken against firm employees.

19.    Helium Advisors maintains, among other programs and files, a Policies and

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 4
No.

Procedures handbook (the "**Compliance Manual**") outlining these compliance steps and requirements. In compliance with applicable regulations, it annually reviews and updates these policies and every year it requires employees to review and certify their understanding of those policies.

20.    Given the rigorous regulatory environment in which Helium operates, Helium devotes extensive resources to develop and assess efficiencies around compliance and other reporting obligations, including models to ensure the firm, its employees, and its affiliates and partners fully comply with applicable regulations.

21.    Additionally, and in connection with the certifications, credentials, and other licenses just described, Helium is a fiduciary to its clients, required under applicable law and specific regulations to, among other duties, deliver accurate and complete information to clients, act in its clients' best interests at all times without personal or other conflicts of interest, and also operate the firm with the requisite care and diligence necessary to protect and fulfill its clients' interests.

22.    Paramount among these fiduciary duties is the obligation to use any means necessary to avoid any error or other compliance lapse that would harm or otherwise jeopardize Helium's clients. This includes, among other priorities, the safekeeping of clients' confidential financial and personal information. Any breach of that confidentiality not only exposes clients to potential harm but severely undermines Helium and its ability to operate, both as a revenue-producing firm and as a firm licensed to provide investment and wealth management services.

23.    Among other requirements, Helium's Compliance Manual requires all personnel to follow Helium's Standard of Conduct, Fiduciary Statement, and Code of Ethics Statement, each of which are drafted to reflect the fiduciary duty Helium owes to its clients, and to report any concerns or violations, suspected or otherwise, or failure to comply with securities laws or other duties.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page 5
No.

**Corr Cronin llp**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

24.     Every policy reiterates the importance of safeguarding confidential and material non-public information relating to the firm's clients, those clients' identities and transactions, and advice furnished by Helium to those clients.

25.     Employees are required to report these issues to the Firm's appointed Chief Compliance Officer ("**CCO**"). Helium relies on third-party compliance vendors to track and ensure employees complete necessary initial and annual certifications of the Compliance Manual, among other regulatory and compliance checks.

26.     The Compliance Manual repeatedly emphasizes that any violation of the firm's policies may result in discipline, up to and including termination, in addition to necessary reporting to applicable outside parties, such as regulatory entities like FINRA or the SEC.

**B.     Development of Helium's Client Base, Partner Network, and Valuable IP.**

27.     Helium has unique knowledge and expertise in the investment advisory market that it has developed through 10 years in the industry. Specifically, Helium spent extensive time and financial resources growing its business and establishing and nurturing its client relationships. Additionally, Helium developed strong working relationships with key vendors and partners throughout the United States to expand its market share and strengthen its competitive edge.

28.     Through its specialized vendor and partner relationships, and through its extensive experience in the industry, Helium provides access to investment products and services that its clients would otherwise not be able to obtain on their own.

29.     More specifically, Helium is a comprehensive wealth management and financial advisory organization that specializes in acting as the "quarterback" for its clients' entire financial lives. In this capacity, Helium coordinates and oversees all aspects of a client's financial situation—including investments, estate and retirement planning, insurance strategy, and tax implications—ensuring unified guidance that aligns across multiple disciplines. This integrated model

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 6
No.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

distinguishes Helium from traditional financial advisors because it delivers a seamless, fully coordinated experience for clients. Helium's advisory team sits at the center of that process directing all financial components much like a quarterback directs a team on the field.

30.    Among other competitive advantages Helium created for itself, it was among the earlier firms in its specific market to use CPAs and outside tax entities as a lever and catalyst to accelerate the growth of the assets under its management for the wealth management advisory practice. Helium developed unique ways to implement these frameworks and realized early and meaningful success using and refining these models.

31.    Because of the limited number of individuals with sufficient capital to enroll with financial advisors like Helium, and the even more limited number of individuals with assets necessary to avail themselves of these more holistic offerings, the market among wealth management and financial advisory firms like this is fiercely competitive. Key differentiators in offerings—particularly among the smaller subset of firms offering a packaged management suite of services like Helium—are crucial among who are often discerning and educated customers and potential customers.

32.    To achieve a competitive advantage in this market and over other, competing firms, Helium developed a core set of processes, models, strategies, and other protocols to develop efficiencies in being able to service clients while delivering optimal results on their investments and other wealth strategies. A major component of this competitive advantage is the proprietary methodologies Helium developed behind acquiring, partnering with, and leveraging CPAs and tax firms to drive Helium's wealth management advisory business.

33.    As a further example, once initiated to these other entities, a core proprietary component of Helium's integrated business model is its systematic integration between wealth management services and affiliated or partner tax and accounting firms. Through a deliberate and

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 7
No.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

refined cross-collaboration process, Helium established frameworks to generate wealth management clients originating from tax and accounting relationships. These frameworks include referral infrastructures, client data flow strategies, co-branded service models, collaborative financial-planning processes, and education tailored communication protocols specifically developed to unify advisory, accounting, and tax disciplines.

34.    These developments rely on a series of outside parties, such as large financial services firms like Charles Schwab or Fidelity—often referred to as "custodians" in this context, vendors like tax or accountancy firms, technology companies and other solutions to ensure the performance and security of operations within these workflows, and a host of other vendor and technology relationships, integrations, and trials, to develop the optimal service offerings to Helium's clients.

35.    While Helium's relationship with certain vendors and other third parties is public or at least disclosed to clients or other third parties, the underlying process to engage and implement use of those vendors is a highly confidential trade secret that Helium protects by limiting access to only management or partner-level individuals.

36.    Additionally, Helium's knowledge of what vendors or solutions they decided *not* to use, often at great expense or trial and error, is also closely guarded. A competitor—particularly a firm in the same market in its nascence, and with more risk—would benefit from this information because it would effectively allow that competitor to leapfrog competition and avoid years and related costs arising from the same trial and error.

37.    In short, Helium's development of proprietary workflows, models, and other processes is the product of ten years of trial and error, internal iteration, data testing, and competitive refinement, for which Helium derives tremendous competitive advantage and would confer the same on any competitor trying to develop its own set of processes, or firm itself, and

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 8
No.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    particularly to compete for the same limited base of customers.

2       38.    Second, Helium's business model demonstrates information on customers and

3    clients is itself confidential, proprietary, and a trade secret that Helium closely protects. Because

4    Helium's core offering is financial planning and wealth management on a holistic level, it quickly

5    and comprehensively collects, develops, and refines information and data on specific customers

6    and analysis of the same to put those clients on the best path to their financial goals. While clients'

7    names and addresses may not in themselves be confidential, the compilation of these clients, and

8    panoply of information developed by and through Helium's business model, is a quintessential

9    trade secret, and one that would give a competitor a significant advantage if accessed—sparing

10   that competitor years of work spent around analyzing and developing the best offerings for each

11   customer or the firm's entire client base.

12       39.    Because Helium's industry is also closely regulated and subject to a heavy

13   collection of compliance duties and regulations, clients' involvement with Helium and their

14   underlying information is, by necessity, protected with the utmost care and confidentiality. By

15   regulations alone, this information is not publicly known. In other words, notwithstanding the

16   host of other rigorous protections Helium requires and enforces to keep its detailed customer

17   information protected and confidential, outside rules ensure these protections are in place.

18       40.    This information is not developed without sacrifice, and as such its value is as much

19   about the resources spent developing it as it is the revenue generated from developing and

20   retaining the clients underlying this information. Because Helium's business relationships are

21   central to its success, Helium invests heavily in and prioritizes ongoing contributions of time and

22   other resources to develop and maintain these relationships. In other words, Helium pays its

23   employees to cultivate and sustain enduring business relationships with Helium's clients. Those

24   relationships are intended to benefit Helium and its clients. Helium employees share those

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 9
No.

**CORR CRONIN** LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

benefits by participating in the success of Helium's business.

41.     Helium does very little external marketing to acquire new clients, and many new clients are obtained based on referrals from other satisfied clients. Accordingly, Helium's existing book of clients and their underlying information is the cornerstone of its business.

42.     The development and maintenance of Helium's proprietary information, as described above, occurred in Washington. Helium management is based in Washington.

## C.     <u>**Helium's Proprietary Brightline Program.**</u>

43.     In recent years, Helium considered and implemented an initiative to develop a singular, unified program to better develop and enhance its business and client development channels and external relationships. Helium titled the initiative and the eventual program "Brightline."

44.     Brightline is Helium's proprietary, multi-component program for acquiring, managing, and rewarding external advisor/center of influence ("COI") relationships, which in turn creates a more systematized and reliable chain of new clients and business for Helium, while also creating better investment/buy-in by third party partners and channels. Brightline's model is novel to the industry and its components are not commonly known.

45.     Helium invested significant time and resources into developing Brightline. This included specific research and communication with the SEC—including proprietary application of Helium's unique analysis and interpretation of the SEC's marketing rules, and the development of methods and formulae that distributes value to the parties involved. Described somewhat differently, Brightline's system is a profits-based collective that allowed outside parties to join in Helium's growth by earning a share of the profits (not fees) and potential participating in a future liquidity event that Helium may have at a pre-defined multiple based on business referred.

46.     Brightline's idea is not just a business model, solution, strategy, or concept, but

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 10
No.

eventually Helium's intention is for Brightline to exist as standalone entity. Helium is actively establishing that framework, including incorporating a related LLC and preparing early iterations of the program's operating agreement to include certain preliminary COIs to whom Helium was working to include.

47.    Violet Hungerford ("**Hungerford**"), an Associate Advisor at Helium based in the location where Weeramantry worked, had a role in the discussions to sign on at least one of these preliminary COIs—the same individuals referred to below as Advisor A.

48.    Brightline's entire creation and its individual components are confidential trade secrets that would confer a significant advantage on any competitor able to gain access to its insights without the expenditure of time and resources. Those components include, but are not limited to the following:

- Leveraging AI solutions and techniques and other proprietary formulas/algorithms;
- Proprietary data sets;
- Specially designed referring partner deal terms tailored around Brightline's model;
- Confidential financial and payout metrics; and
- FAQs and scripts.

49.    Helium has already realized significant economic value from Brightline. It implemented an early iteration of Brightline with one COI who, after tangible success, will soon join Helium as a financial advisor with a significant inbound book of business.

50.    Helium took reasonable steps to keep Brightline's development and underlying formulas and methods secret, even after it began to share Brightline as an offering within Helium's marketplace and ecosystem, limiting access and folders to only firm leadership and any others responsible for helping develop the program.

51.    Competitors (especially smaller firms like Oakley or Hyphen) would require

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 11
No.

substantial time and expense to develop Brightline and derive or replicate its intended performance. Helium is aware of no corresponding model in the marketplace and as such asserts it will allow the firm significant competitive advantage, an advantage that a competitor could leapfrog if given access to Brightline's underlying trade secrets.

52.    As with Helium's other proprietary information, the development and maintenance of the core information central to Brightline is in Washington.

**D.    Helium Hires Weeramantry.**

53.    In June 2022, Helium hired Weeramantry as a Senior Financial Advisor.

54.    Before this, Weeramantry was employed at RINA Wealth Management Services LLC ("**RINA**"), where he worked since October 2018. Before this, upon information and belief, Weeramantry worked at several brokerage firms and was not engaged in any investment advisor or wealth management role.

55.    Weeramantry departed RINA to work for Helium with another financial advisor named Kenneth Ancell ("**Ancell**"). At the time of his departure, Weeramantry held a 10% ownership interest in RINA.

56.    Shortly before this, on or about March 2, 2022, upon Helium's information and belief, Weeramantry incorporated Oakley.

57.    On June 1, 2022, as a condition of his employment and base compensation, Helium required Weeramantry to sign an employment agreement (the "**Weeramantry Agreement**") containing restrictive covenants, including, but not limited to, his agreement to maintain the confidentiality of Helium's confidential and proprietary information and trade secrets.

58.    Among other terms, the Weeramantry Agreement required Weeramantry to abide by all Helium policies, handbooks, and procedures, to return all information and other Helium materials upon termination. It also specified that he would have no authority to bind or obligate

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page 12
No.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Helium to any promise or obligation without approval by necessary management.

59.    On August 23, 2022, Weeramantry executed the Weeramantry Agreement. He was registered with the SEC as an advisor with the firm around the same time. Ancell's SEC record also indicates an August 22, 2022 registration date.

60.    In his role, Weeramantry was responsible for developing new client relationships and nurturing Helium's existing client relationships.

61.    Based on his position, Helium gave Weeramantry access to a host of existing clients and its suite of financial and investment services, including, but not limited to the models and protocols listed above to enable him to deliver financial services consistent with the firm's offerings and ethos, with the expectation that Mr. Weeramantry would further cultivate these relationships and develop new client relationships for Helium.

62.    At the time Weeramantry joined Helium and throughout his tenure at the firm he required constant support by other personnel and resources in the firm to fulfill his job duties. This was a departure from other advisors, who were more self-supporting and required less participation by other personnel. For example, Weeramantry heavily relied on Helium's CIO, partners, and other senior personnel to join him in client meetings with clients to speak to economic situations or direct portfolio management. As another example, Weeramantry acknowledged his limited knowledge or understanding of on Helium's holistic offerings and portfolio of services in multiple emails and other communications where he would ask personnel that included, among other individuals, Helium Founder, Partner, and Chief Compliance Officer, Howard Morin ("**Morin**"), Helium Founder and Partner Gary Russell ("**Russell**"), and JJ Feldman, Helium's Head of Wealth Management and Partner ("**Feldman**") to write emails for him to clients, or join him in meetings because he was uncertain about what to do. Given the mission critical role Morin, Russell, and Feldman each play at Helium and Weeramantry's senior position and job duties, the need for

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 13
No.

support at this level was unusual and demonstrated the unique nature of Helium's services and the proprietary, firm-specific nature of its solutions.

63.    Despite requiring constant support from Helium's leadership, upon Helium's information and belief, Weeramantry would regularly tell firm clients he was shouldering the burden of the services given to them and take personal credit for these services and solutions.

64.    In no uncertain terms, Weeramantry required on the job learning to work within Helium's business model and relied on a greater than usual amount of resources and support by other firm leadership to properly translate and help deliver Helium's unique and holistic offerings to the clients under Weeramantry's management.

65.    During his time at Helium and in connection with his senior positions at the firm, Weeramantry necessarily had access to Helium's entire client database, including detailed customer information that includes, among other data, customer contact information, sensitive financial information, prior communications, and other information, data, and analysis—all information and data stored, developed, and managed at Helium's Everett, Washington headquarters—that Helium devoted time and resources over almost a decade to compile. Weeramantry also had access to other confidential and proprietary Helium information, including, but not limited to folders in Helium's systems that were restricted to only Helium partners. These folders included certain of Helium's most sensitive and important initiatives and other trade secrets, including, but not limited to, Helium's "Brightline" initiative.

66.    During his time at Helium and in connection with his senior positions at the firm, Weeramantry made multiple trips to Washington to meet with Helium clients, tax staff, Helium management, and for annual planning and partner retreats. Weeramantry similarly had ongoing contact with the same parties via virtual media like web conferences. During these meetings, and in the other trainings and work-related functions in which Weeramantry participated, Weeramantry

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 14
No.

was provided with access to and knowledge of Helium's proprietary information.

67.    On September 1, 2022, shortly after Weeramantry joined, Helium Financial executed its Amended and Restated Limited Liability Company Agreement, dated September 1, 2022 (the "**2022 Operating Agreement**.")

68.    On or about December 2022, Hungerford began working at Helium as an Associate Advisor. Hungerford worked out of the Lafayette, California location where Weeramantry was based.

**E.    Weeramantry's Former Employer Sues Him for Trade Secret Misappropriation to Solicit Clients.**

69.    Weeramantry's first year at Helium was not without incident.

70.    For example, on May 16, 2022, within days of their start at Helium, RINA filed a lawsuit in California state court against Weeramantry and Ancell alleging that they misappropriated RINA's trade secrets to solicit RINA's clients (the "**2022 RINA Lawsuit**"). The complaint included a claim for unfair competition.

71.    On August 1, 2022, RINA and its affiliates filed a first amended complaint, adding claims for intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, and civil conspiracy.

72.    The 2022 RINA Lawsuit arose from Weeramantry and Ancell's creation of an entity called RISE Family Office, through which RINA alleged that Weeramantry and Ancell retained and accessed non-public client information that RINA claimed was a protectable trade secret. Helium was not named in the suit.

73.    In late 2022, the parties to the 2022 RINA Lawsuit executed a confidential settlement agreement that, among other terms, required Weeramantry and Ancell to pay a confidential amount to RINA in installments. Weeramantry also agreed to assign his entire 10%

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page 15
No.

1     membership interest back to RINA.

2     **F.     Weeramantry, Through Oakley, Takes an Ownership Interest in Helium.**

3          74.     On July 1, 2023, Helium Financial, Weeramantry and Oakley entered into a

4     Member Interest Exchange Agreement (the "**Exchange Agreement**") pursuant to which Helium

5     acquired Weeramantry's seventy percent (70%) interest in a group of accounts called the RISE

6     Family Office Book of Business ("**RISE Book**"). In exchange for the transfer of Weeramantry's

7     interest in the RISE Book, Oakley received four percent (4%) membership interest in Helium

8     Financial. At the time of executing the Exchange Agreement, Helium Financial was owner of the

9     other thirty percent (30%) of the RISE Book.

10         75.     The Exchange Agreement included a schedule identifying all the clients

11    comprising the RISE Book, and at ¶ 3(a) the parties acknowledged their mutual intent to perfect

12    Helium Financial's title in and to the transferred property (i.e., the RISE Book clients and

13    accounts). The Exchange Agreement was subject to the 2022 Operating Agreement, which, among

14    other terms, provides that Washington law governs the parties to the Operating Agreement, such

15    as Members like Oakley, as to any matters arising therein.

16         76.     Seemingly to clarify other possibly inconsistent terms, Weeramantry has since

17    confirmed, reiterated, and asserted that the Exchange Agreement created a membership interest

18    in Oakley, not him individually.

19         77.     Ultimately, the Exchange Agreement gave Weeramantry, through Oakley, the third

20    largest ownership percentage in Helium.

21         78.     For all intents and purposes, Weeramantry held a partnership and membership

22    position in his capacities at Helium, and his duties and responsibilities were commensurate with

23    that title. For example, on July 1, 2024, Helium Financial executed its Amended and Restated

24    Limited Liability Company Agreement (the "**2024 Operating Agreement**"). The 2024 Operating

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 16
No.

Agreement recited the same membership terms and included a Washington choice of law for any related disputes. On the same date, Helium Advisors prepared and entered a new Compliance Manual. Among other terms, there is a section titled "Death of Key Personnel," which addresses particular Helium personnel that, in the event of their death, might render it impossible for the firm to properly function. None of the Key Personnel held titles beneath Partner. Along Morin, Russell, Stephanie Ridley—Helium's Chief Operating Officer and Partner, and JJ Feldman—Helium's Head of Wealth Management and Partner, Weeramantry is also listed as "Key Personnel."

79.    Finally, between 2024 and 2025, Helium paid and relied on Weeramantry to lead the Brightline initiative in implementing it in the marketplace among clients and other potential channels. As such, Weeramantry was invited to Brightline strategy meetings and given access to the confidential firm information and trade secrets used to build and operate Brightline. This included, for example, a partner-only retreat in 2024 in Washington state. Early Brightline marketing materials used to pitch COI partners listed Weeramantry as the lead and point of contact.

**G.    Helium Hires Amini.**

80.    In July 2022 Helium hired Amini as Chief Investment Officer.

81.    Before this, Amini held positions at Highline Wealth Partners and a predecessor entity, where, upon information and belief, he worked from 2014 until July 2022.

82.    Amini is also a licensed attorney and is a member of the New York State Bar. His public web profiles, including on sites like LinkedIn, include the suffix "Esq." following his name.

83.    On July 11, 2022, as a condition of his employment, Helium presented Amini with an employment agreement containing restrictive covenants, including confidentiality and non-solicitation provisions (the "**Amini Agreement**").

84.    In the Amini Agreement, Amini and Helium agreed to resolve any disputes in King

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 17
No.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

County Superior Court under Washington law.

85.    Helium designed Amini's primary role around is CIO duties—namely to drive its investment and research strategy and improve the firm's portfolio performance. Amini's job duties to help improve and oversee Helium's trading and investment strategy necessarily required him to service Helium's entire national base of clients, the majority of whom live or reside in Washington state.

86.    In this role, Helium entrusted Amini with ongoing access to Helium's valuable and confidential customer information, trade secrets, and other confidential and proprietary information.

87.    For example, while at Helium, Amini had access to Helium's entire client database, including detailed customer information that includes, among other data, customer contact information, sensitive financial information, prior communications, and other details that Helium devoted time and resources over almost a decade to compile. Amini also had full access to Helium's electronic records, all trading platforms, and the firm's Customer Relationship Management ("CRM") system, all information and data stored, developed, and managed at Helium's Everett, Washington headquarters.

88.    Amini's performance also created some early concerns. For example, in April 2023, Amini attended in-person meetings with Helium's leadership in Atlanta, where he was included in high-level and confidential strategy discussions. Morin, the Company's CCO, addressed Helium's concerns to Amini not to assume or otherwise try to fulfill any compliance or legal matters unless Morin and Helium's leadership otherwise approved, noting these duties were only secondary to Amini's CIO role.

89.    Among other concerns, Amini, who is a licensed attorney, was making compliance and legal decisions on the Company's behalf. He also assisted personnel with legal questions

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 18
No.

without Morin and Helium's approval or oversight. Morin reiterated this admonition in emails following those meetings.

90.    During his time at Helium Amini and in connection with his senior positions at the firm, Amini regularly met with Helium's clients in Washington and elsewhere, Helium management, and for other annual planning and other meetings. During these meetings, and in the other trainings and work-related functions in which Amini participated, Helium provided Amini with access to and knowledge of Helium's proprietary information.

**H.    Helium Seeks To Protect Its Proprietary Information.**

91.    Helium took extensive measures to protect its confidential and proprietary information and trade secrets. These measures included, for example, mandating password protection on all Helium computers and presenting all new employees with an employment agreement containing prohibitions on using or disclosing Helium's confidential and proprietary information and trade secrets and from interfering with Helium's business relationships.

92.    For example, Helium's employment agreements—including those signed by Weeramantry and Amini—read in relevant part:

> Employee acknowledges and agrees that in the course of Employee's employment with Company, Employee may be expected to develop a personal relationship with the Company's clients and to procure knowledge concerning those clients' affairs and business needs, and that *the relationship of the Company with its clients will therefore be placed in the Employee's hands in confidence and trust*. Employee further acknowledges and agrees that, in order to effectively perform his or her job duties, it will be necessary for Employee to have access to confidential and proprietary information of the Company and/or its clients, service providers, affiliates and business partners ("Confidential Information"). Employee therefore agrees to preserve and protect Confidential Information. Without limiting the foregoing, *Employee agrees that he or she will not, alone or in affiliation with any other individual or entity, except as may be necessary to properly perform*

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 19
No.

**CORR CRONIN** LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

*Employee's job duties for the Company, use or disclose Confidential*
*Information to anyone outside of Company or for Employee's own*
*benefit or the benefit of any individual or entity other than Company.*

(Emphasis added)

93.    The Helium employment agreements which Weeramantry and Amini signed also read, in relevant part:

> All tangible items embodying or disclosing any portion of Confidential Information shall be and remain the property of Company and shall be returned to Company upon termination of this Agreement or earlier request of an officer of the Company. At such time, Employee shall also assemble all tangible items of work in progress, notes, plans and other materials related in any way to Employee's service hereunder, and will promptly deliver such items to Company.

94.    In addition, Helium required all employees, including Weeramantry and Amini, to read and acknowledge Helium's Employee Handbook and Compliance Manual, which included Helium's personnel policies, codes of conduct, and information security policies.

95.    Specifically, the Helium Employee Handbook requires employees to preserve and protect Helium's confidential information and lists examples of the types of information the company considers confidential, including "client information and records," "proprietary production processes," and "marketing strategies." The handbook also warns that employees who misuse or disclose confidential information may be subject to disciplinary action, including termination of their employment and legal action.

96.    Furthermore, the handbook advises that "electronic mail is always subject to monitoring, and the release of specific information is subject to applicable laws and company rules, policies, and procedures on confidentiality. Existing rules, policies, and procedures governing the sharing of confidential information also apply to the sharing of information via commercial software."

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page 20
No.

97.     Helium's Compliance Manual includes a lengthy Information Security Policy that outlines over six pages a variety of protections, including, but not limited to, various password controls for all firm technology and personal mobile devices, web and network security programs that it implements, workstation and device locking protocols, data encryption, annual training and certification requirements, and other email and software guidelines.

98.     Helium's Information Security Policy is closely managed. For example, it requires approval from Helium's Chief Compliance Officer ("CCO") before any access controls and other staff credentials are issued, modified, or otherwise revised. This includes the CCO's approval for any staff administrative privileges.

99.     Helium employs fulltime information technology personnel to oversee its systems and closely monitors compliance with these policies and procedures to, in turn, ensure compliance with applicable regulations surrounding client information and other requirements set forth under state and federal law administered by bodies like the SEC and similar rules by independent regulators like FINRA.

100.    Finally, Helium maintains third-party vendor security and diligence protocols to ensure IT vendors and other third-party partners and vendors are vetted with sufficient diligence before engagement and are otherwise subject to controls like non-disclosure agreements. Upon engagement, all third-party vendors are required to, at a minimum, comply with Helium's information security policies.

101.    Weeramantry and Amini affirmatively acknowledged and agreed to abide by these personnel policies.

**I.      Helium Terminates Weeramantry and Amini's Employment Following Misconduct and other Concerns.**

102.    Helium's management had ongoing concerns about Weeramantry and Amini's

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 21
No.

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

performance. Starting in early 2023, their attention to client needs and communications began to stagnate for certain clients, including their failure to make trades on clients' behalf and other shortcomings.

103.    On May 22, 2024, Weeramantry advised Morin and Russell of his receipt of a complaint concerning alternative investments Weeramantry and Ancell sold to two clients prior to joining Helium (the "**RINA Client Complaint**"). As Helium was not involved in the transactions which formed the bases of those clients' complaints, Helium was not named in the RINA Client Complaint.

104.    On or around September 2024, Amini, who includes "Esq." in his email signature, appeared to be advising Weeramantry and others on a series of legally complicated transactions Weeramantry was discussing with outside third parties. Amini's initial advice was outside the Firm's protocol to run such issues through the CCO and also counter to Morin's earlier directives that Amini should not freelance on legal advice without involving Company management. Amini eventually escalated it to Morin who promptly shut the issue down.

105.    On December 19, 2024, the parties to the RINA Complaint engaged in mediation. Helium was not involved in the mediation and did not attend.

106.    On or around early 2025, Helium created a private equity affiliate to expand other possible client services.

107.    Following creation of this private equity affiliate, Helium's leadership heard that Weeramantry was falsely telling clients that Helium was using client capital to help jumpstart and fund this new affiliate, a claim, if actually asserted, was both false and would create significant compliance issues and potential reputational harm for Helium. Helium's concerns were corroborated after Weeramantry angrily confronted its management in several instances tying similar assertions to his alleged entitlement to revisions to his compensation package.

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 22
No.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

108.    In January 2025, Ancell left Helium.

109.    Around the same time, Morin learned that Weeramantry engaged another firm client in an authorized private placement transaction without providing notice to Morin or Helium's leadership. Morin addressed this with Weeramantry and informed Weeramantry of Helium's possible FINRA reporting obligations depending on the consequences of the transgression. This conversation took place over Zoom and Helium's other partners were in attendance.

110.    On May 20, 2025, without Helium's knowledge or consent, Weeramantry signed a Settlement Agreement and Release to settle the claims alleged in the RINA Complaint (the "**RINA Settlement Agreement**"). The RINA Settlement Agreement identified Helium Advisors as a party. Specifically, it named Helium Advisors, along with Weeramantry and others as "Defendants." Helium never received a draft of this agreement nor was it aware Weeramantry or Amini were negotiating it or entering the agreement. Helium also cannot confirm whether Weeramantry or Amini were advised by counsel during the negotiation of this agreement or sought any legal or other advice in settling those claims.

111.    Weeramantry signed the Settlement Agreement on behalf of himself individually and on behalf of Helium Advisors. Weeramantry did not have the authority to sign on Helium Advisors' behalf.

112.    Both Weeramantry and Amini participated in negotiating the RINA Settlement Agreement. However, Morin and Russell only discovered that Helium Advisors had been added as a Defendant to the RINA Settlement Agreement on July 17, 2025, nearly two months after Weeramantry executed the RINA Settlement Agreement.

113.    Among other major concerns, Weeramantry, Amini, and all other Helium employees are required to report any potential compliance issues per the firm's compliance policies to Morin in his capacity as Chief Compliance Officer. Helium being identified or named as a defendant in

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 23
No.

any claim, suit, or other context, particularly where the claims involved client complaints over investment advice, is an obvious compliance issue.

114.    Weeramantry and Amini's actions also exposed Helium to other legal and regulatory harm by involving it in a legal dispute to which it was not a party.

115.    On July 18, 2025, following the discovery of Weeramantry's and Amini's violations of Helium's compliance policies, signing on behalf of Helium Advisors, without requisite authority changing Helium's status from being a disinterested, non-party to the RINA Complaint—as Helium previously understood their posture in that dispute— to a named Defendant in the Settlement Agreement, and other serious concerns attendant to this conduct, Helium terminated Weeramantry's and Amini's employment.

116.    Despite their obligations to return Helium property, Amini and Weeramantry failed to immediately comply.

117.    On or around August 8, 2025, after around two weeks of back and forth with Amini, Amini finally returned his Helium-issued laptop computer. Helium supplied this laptop to him solely to help him fulfill his job duties. However, after Amini returned the company-issued laptop, Amini has refused to provide the laptop's login credentials to Helium, despite Helium's request. This login information lets Helium access the records and information stored on the computer, including Amini's work product and works in progress he developed in his capacity as Helium's Chief Investment Officer. Amini's failure to provide this information not only effectively deprives Helium of access to its own property and breaches Amini's contractual obligations to Helium but creates significant other concerns about Amini's use of Helium's property and information, plus Amini's professional compliance obligations under his CFA license and other qualifications.

118.    Within days of their departure from Helium, Weeramantry and Amini appear to have started Hyphen, a competing enterprise—what appears to be a "clone" of Helium's business model

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page 24
No.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

in startup form, and began systematically using Helium's trade secrets and other valuable confidential business information to steal Helium's customers and valuable information, and to intentionally interfere with and deprive Helium of its business expectancy with its clients.

**J.      Weeramantry and Amini Misappropriate Helium's Confidential Information and Trade Secrets for Hyphen/Oakley's Benefit.**

119.    On July 31, 2025, two weeks after Weeramantry and Amini were terminated from Helium's employ, Hyphen was officially registered as an LLC with the California Secretary of State. Weeramantry is listed as the registered agent for Hyphen and Amini is listed on other filing documents.

120.    Upon information and belief, Amini began working for Hyphen and Weeramantry on or about July 31, 2025.

121.    Following the termination of Weeramantry and Amini, Helium began monitoring their Helium email accounts for any incoming client requests and correspondence.

122.    Several Helium clients sent emails to Weeramantry's former Helium email address, likely by mistake. Those emails indicated the clients ("**Client A**" and "**Client B**") were following up on meetings they had with Weeramantry since his departure from Helium. Both Client A and Client B have since ended their business relationship with Helium and transferred their business to Weeramantry and Hyphen.

123.    On September 4, 2025, Helium emailed Weeramantry expressing concerns about Weeramantry's use of Helium's trade secrets and confidential information and efforts to interfere with and disrupt Helium's client relationships—the same trade secrets, confidential information, and client relationships held, owned, and maintained by Helium in Washington.

124.    On September 11, 2025, Weeramantry responded to Helium's email to "categorically deny" any wrongdoing, including soliciting or enticing clients to transfer their

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page 25
No.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

business to him.

125.    On September 10, 2025, Helium received an email to Weeramantry's former Helium email address from a registered advisor with whom Weeramantry was connected through his work with Helium and Helium's Brightline efforts (hereinafter, "**Advisor A**"). The email thanked the addressees, including other financial and real estate professionals, for their attendance at the prior evening's dinner event, and expressed an intention to connect the group via email. Prior to his departure from Helium, Weeramantry was seeking to enroll Advisor A in a new Helium initiative called Brightline that utilized a proprietary, paid referral process that Helium developed.

126.    On information and belief, Weeramantry used and disclosed Helium's trade secrets, including its methodologies, tools, and proprietary processes developed in Washington, such as Brightline, for his own benefit and Hyphen's benefit during and after the dinner event with Advisor A on September 9, 2025.

127.    Furthermore, Advisor A was among the COIs through which Helium was working to implement Brightline and to whom Helium sent an agreement to proceed with a relationship under the Brightline model. Emails indicate that Weeramantry was and is using the Brightline model and its proprietary trade secrets, among other confidential strategic and proprietary information—that is Helium's lawful intellectual property—to intercept these relationships and improperly use Brightline for his and Hyphen's benefit.

128.    On September 10, 2025, Helium forwarded a letter to Amini demanding that he provide the login credentials to access his Helium laptop.

129.    On September 19, 2025, via counsel, Amini responded that he no longer has the login information, asserting that it may have been destroyed with other documentation containing confidential and proprietary information following his termination as required by Helium. Helium believes Amini destroyed this information in his efforts to deprive Helium from accessing his

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page 26
No.

computer, breaching Helium's policies, Amini's own contractual duties to Helium, and other legal obligations. Among other harm, Helium believes Amini retained valuable work product on that machine related to several projects that Helium is now unable to access.

130.    On September 22, 2025, Client A sent an email to Weeramantry's former Helium email to ask if Weeramantry planned to contact "Helium about the change" and asked for additional information on the transition process of their accounts from Helium to Hyphen. Client A subsequently terminated their business relationship with Helium and transferred their business to Weeramantry and Hyphen.

131.    On October 2, 2025, Client B sent an email to Weeramantry's Helium email noting they were confirming that after checking their accounts with one of the two custodians Helium uses to hold client assets, they had moved all but one of their accounts to Hyphen. Client A subsequently terminated their business relationship with Helium and transferred their business to Weeramantry and Hyphen.

132.    On information and belief, Weeramantry used and disclosed Helium's trade secrets, including the identities and contact information of its clients, their business needs, and account details, as developed and compiled by Helium, for his own benefit and the benefit of Hyphen, to solicit Client A and Client B to move their business away from Helium and transfer it to Weeramantry and Hyphen.

133.    On or around September 24, 2025, Hungerford resigned her employment at Helium and joined Hyphen. Almost immediately, Helium learned that Hungerford was assisting Hyphen, Weeramantry, and Amini in their unlawful interference with Helium's business relationships and theft of Helium's valuable trade secrets.

134.    The following week, notwithstanding Helium's prior warnings to Weeramantry and proposed terms to finalize the redemption agreement, Weeramantry, Amini, and Hyphen caused a

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 27
No.

heavy volume of Helium customers to leave and join Hyphen. In so doing, Weeramantry, Amini, and Hyphen have caused harm to Helium.

## IV.    CLAIMS

### COUNT I – Washington Uniform Trade Secrets Act (RCW 19.108.010, *et seq.*)
### (Against All Defendants)

135.    Helium realleges and incorporates the preceding paragraphs as if set forth fully herein, to the extent not inconsistent herewith.

136.    Helium has invested countless time and financial resources to locate, vet, and establish its network of vendors, partners, client channels, and individual vendor and partner contacts. Moreover, the value of Helium's vendor information includes the efforts and expenses to determine which vendors, partners, and channels to use and which failed to meet Helium's standards or its clients' needs.

137.    In addition, Helium expended substantial efforts, through the development of its investment advisory offerings, tax planning and integrations services, as well as its client service and resulting referrals, to identify and cultivate its client base. It would be difficult, if not impossible, for someone, such as Weeramantry or Amini, to start a new company, such as Hyphen, without the detailed analysis, significant expense, and client information obtained (and subsequently misappropriated) during their employment with Helium, nor could they continue the suite of holistic service offerings to which these customers were accustomed at Helium without using Helium's proprietary models, formulae, technology programs and formats, and other information that Helium guards as valuable trade secrets.

138.    Helium's vendor and client information is not readily knowable by competitors and is not readily accessible through proper means.

139.    Helium derives independent economic value and a competitive advantage from the

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 28
No.

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

fact that its vendor information and client information, and related processes to leverage both, are not generally known or readily ascertainable.

140.    Helium took commercially reasonable steps to protect its confidential and proprietary information, including, without limitation, implementing personnel policies regarding confidential and proprietary information, presenting employees with contracts prohibiting use and disclosure of Helium's trade secrets and confidential and proprietary information, access controls to Helium folders and devices based on position and job duties, subjecting vendors, external technology partners, and other potential and active partners to NDAs, and requiring that all Helium computers be password protected.

141.    Helium's confidential and proprietary information, as described above, were developed and maintained by Helium management in Washington and Defendants gained access to Helium's confidential and proprietary information by virtue of their employment by Helium, through repeated trips to Washington for management and client meetings, and by virtue of their purposeful and continuous contact with Helium's Washington-based personnel and resources.

142.    Thus, Helium's vendor and client information, partner information, models, processes, strategies, and initiatives, constitute protectable trade secrets under Washington law.

143.    Defendants knew that the information entrusted to Weeramantry, Amini, and Hungerford concerning Helium's clients and vendors was confidential trade secret information not to be revealed or used outside of Helium.

144.    Defendants knew that the information entrusted to Weeramantry, Amini, and Hungerford concerning Helium's models, processes, datasets, technology frameworks, and initiatives like Brightline were and are confidential trade secret information not to be revealed or used outside of Helium.

145.    Defendants further knew that the information regarding Helium's vendors and

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page 29
No.

clients are a valuable commercial asset of Helium, and that Helium expended much time, effort, and money developing this trade secret information.

146.    Upon information and belief, Weeramantry and Amini retained Helium's trade secrets and, upon termination of their employment with Helium, shared them with Hyphen and Oakley, for those entities' benefit. Weeramantry and Amini's conduct enabled Hyphen and Oakley to misappropriate these trade secrets, and, therefore, compete unfairly against Helium by benefitting from the resources and efforts Helium invested in creating and obtaining its client and vendor information, partner information, and other valuable trade secrets.

147.    Upon information and belief, at the time Defendants copied, retained, or otherwise used Helium's trade secret information, all Defendants knew, or reasonably should have known, that they acquired the trade secret information under circumstances giving rise to a duty to maintain secrecy or limit its use.

148.    By engaging in the conduct described herein, Defendants misappropriated Helium's trade secrets in violation of the Washington Uniform Trade Secrets Act, RCW 19.108.20 and 19.108.30.

149.    The trade secrets that Weeramantry and Amini took from Helium are integral to Helium's competitive advantage in the marketplace, and if the information behind Helium's trade secrets becomes known to Helium's competitors, Helium will suffer irreparable harm.

150.    Defendants' violation of this statute already harmed and will continue to irreparably harm Helium unless and until this Court enters a permanent injunction, enjoining and restraining Defendants from using Helium's trade secrets.

151.    Upon information and belief, Defendants' misappropriation of Helium's trade secrets was and is willful and malicious, thereby entitling Helium to exemplary damages and attorney's fees pursuant to the Washington Trade Secrets Act, RCW 19.108.30 and 19.108.40.

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 30
No.

**CORR CRONIN** LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## COUNT II – Violation of the Defend Trade Secrets Act (§ 1836 *et seq.*)
### (*Against All Defendants*)

152.    Helium realleges and incorporates the preceding paragraphs as if set forth fully herein, to the extent not inconsistent herewith.

153.    During their employment with Helium, Amini and Weeramantry had direct and  intimate knowledge of Helium's confidential and proprietary business information and trade secrets, which information is exclusive to Helium and not generally known in the industry.

154.    Helium's confidential and proprietary information that Amini and Weeramantry accessed during their employment constitute trade secrets within the meaning of the Defend Trade Secret Act ("**DTSA**") because the information derives independent economic value, actual and potential, from not being generally known to or readily ascertainable through appropriate means by other persons who might obtain economic value from its disclosure or use, and are the subject of Plaintiffs' efforts, as described above, that are reasonable under the circumstances to maintain their secrecy.

155.    Helium uses these trade secrets to market and sell its products and services in interstate commerce.

156.    Helium Financial Group has standing to join in this cause of action as the parent and owner of Helium Advisors and its assets, which includes the firm's trade secrets. Helium also executed various contracts with Defendants wherein Helium sought to protect Helium's trade secrets and thus its own interests as owner of Helium.

157.    Amini and Weeramantry  obtained trade secrets while employed by Helium and under a duty to maintain their secrecy, and Helium did not give Amini and Weeramantry permission to use or disclose those trade secrets in the course and scope of their work on behalf of Hyphen, Oakley, or otherwise.

158.    Helium's confidential and proprietary information, as described above, were

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 31
No.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

developed and maintained by Helium management in Washington and Defendants gained access to Helium's confidential and proprietary information by virtue of their employment by Helium, through repeated trips to Washington for management and client meetings, and by virtue of their purposeful and continuous contact with Helium's Washington-based personnel and resources.

159.    Hyphen and Oakley knew or should have known that Amini and Weeramantry would have acquired Helium's trade secrets under a duty to maintain their secrecy.

160.    Upon information and belief, Defendants are using Helium's trade secrets to truncate the time needed to enter markets competitive with Helium, to compete unfairly in the marketplace, and target Helium's customers, vendor relationships, and existing and potential partner relationships. All of these activities improperly capitalize on Helium's investment in time, resources, and goodwill.

161.    As a result of Defendants' misappropriation, disclosure, and use, Helium has suffered, and will continue to suffer, irreparable harm in the form of actual and threatened misappropriation of Helium's trade secrets and confidential information, harm to their goodwill and business reputation, and loss of confidence and trust among its customers.

162.    Helium has also suffered present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

163.    Unless restrained, Defendants will continue to misappropriate Helium's trade secrets, causing continuing and irreparable injury to Helium for which there is no adequate remedy at law.

164.    Pursuant to 18 U.S.C. § 1836(b)(3), Helium is entitled to a permanent injunction barring Defendants' continued actual and threatened misappropriation of Helium's trade secrets as set forth hereinabove.

165.    Helium is further entitled to an award of actual damages incurred as a result of

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 32
No.

Defendants' wrongful acts, as well as an award of damages equal to their unjust enrichment and/or the imposition of a reasonable royalty as provided under the DTSA, § 1836(b)(3)(B).

### COUNT III – Breach of Contract – Exchange Agreement
**(Oakley Partners)**

166.    Helium realleges and incorporates the preceding paragraphs as if set forth fully herein, to the extent not inconsistent herewith.

167.    On July 1, 2023, Helium Financial, Weeramantry and Oakley entered into the Exchange Agreement pursuant to which Helium acquired Weeramantry's seventy percent (70%) interest in the RISE Book. In exchange for the transfer of Weeramantry's interest in the RISE Book, Oakley received a four percent (4%) membership interest in Helium Financial. At the time of executing the Interest Exchange Agreement, Helium Financial was owner of the other thirty percent (30%) of the RISE Book.

168.    Pursuant to the Exchange Agreement, Oakley agreed to surrender its RISE Book clients.

169.    Oakley breached the Exchange Agreement by taking those RISE Book customers from Helium for use by Hyphen, a Helium competitor.

### COUNT IV – Breach of Contract – Employment Agreement
**(Amini)**

170.    Helium realleges and incorporates the preceding paragraphs as if set forth fully herein, to the extent not inconsistent herewith.

171.    The Amini Agreement is a valid contract between Helium and Amini.

172.    Amini was obligated to comply with all terms, conditions, duties, obligations, representations, and warranties in the Amini Agreement.

173.    The Amini Agreement's terms expressly required Amini to not solicit Helium

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 33
No.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    employees or clients during Amini's employment and for at least two years after the date he was

2    separated from the company.

3        174.    Amini breached the Amini Agreement because, upon information and belief, while

4    he was a Helium employee or shortly after his employment ended, he induced Hungerford to

5    terminate her employment with Helium.

6        175.    Amini breached the Amini Agreement because, upon information and belief, while

7    he was a Helium employee or shortly after his employment ended, he assisted Hyphen with

8    interfering with Helium's business relations.

9        176.    Amini's breaches of the Amini Agreement harmed Helium, whose damages include,

10   but are not limited to, the loss of valuable employees, loss of goodwill in Helium's business, the

11   costs of retaining and protecting employees and company information, the cost of finding and hiring

12   new employees to replace the employees that Amini helped unlawfully solicit from Helium, other

13   irreparable harm for which there is no legal remedy, and other damages to be proven at trial.

14   ### COUNT V – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AND BUSINESS EXPECTANCY
15   **(Against All Defendants)**

16       177.    Helium realleges and incorporates the preceding paragraphs as if set forth fully

17   herein, to the extent not inconsistent herewith.

18       178.    While employed with Helium, Amini and Weeramantry gained access to and

19   knowledge about Helium's confidential information and trade secrets, including, but not limited

20   to, the compilation of its valuable customer information and those clients' business needs.

21       179.    Upon information and belief, Amini and Weeramantry were aware of Helium's

22   contracts and business expectancies with respect to certain Helium clients.

23       180.    Upon information and belief, Amini and Weeramantry wrongfully induced Helium

24   clients to transfer their business away from Helium for the benefit of Hyphen and Oakley by

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 34
No.

unlawfully using Helium's confidential information and trade secrets.

181.    Upon information and belief, Amini and Weeramantry wrongfully induced Helium partners and potential partners to transfer their business away from Helium by unlawfully using Helium's confidential information and trade secrets for the benefit of Hyphen and Oakley.

182.    Further, upon information and belief, Hyphen and Oakley are aware of Helium's business expectancy with respect to its current vendors, partners, and clients.

183.    Upon information and belief, Hyphen and Oakley are aware that Helium's continuing profitability requires Helium to meticulously maintain its relationships with its clients and vendors.

184.    Upon information and belief, Hyphen and Oakley are aware that Weeramantry and Amini have an obligation to maintain the confidentiality of Helium's trade secrets, including, but not limited to, its confidential vendor and client information.

185.    Hyphen and Oakley induced Weeramantry and Amini to disclose this confidential information and trade secrets regarding Helium's vendors and clients, to the detriment of Helium's business relations.

186.    Additionally, Hyphen and Oakley have placed Weeramantry and Amini in positions where they will inevitably disclose this information, to the detriment of Helium's business relations.

187.    Weeramantry and Amini did in fact breach their obligations to Helium, as set forth above, by improperly disclosing, and using Helium's confidential and trade secret information.

188.    Helium has been harmed and will continue to be irreparably injured by Defendants' intentional interference with Helium's contractual relations and business expectancies.

## **COUNT VI – CIVIL CONSPIRACY**
### **(Against All Defendants)**

189.    Helium realleges and incorporates the preceding paragraphs as if set forth fully

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 35
No.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

herein, to the extent not inconsistent herewith.

190.    In their positions at Helium, Amini and Weeramantry were intimately involved with Helium's business and operations, including daily contact with vendors and clients.

191.    Upon information and belief, Hyphen and Oakley were aware of the intimate knowledge and involvement Weeramantry and Amini had with Helium's vendors, partners, and clients and their access to Helium's valuable trade secrets.

192.    Upon information and belief, Hyphen and Oakley conspired with Weeramantry and Amini and formed an agreement to compete against Helium by unlawfully misappropriating, retaining, disclosing, or otherwise using Helium's confidential information and trade secrets.

193.    Upon information and belief, Defendants still have access to Helium's confidential and trade secret information and continue to use such confidential and trade secret information for Defendants' benefit.

194.    Helium has been harmed and will continue to be irreparably injured by Defendants' concerted actions. As such, Helium is entitled to permanent injunctive relief.

## <u>COUNT VII – INJUNCTIVE RELIEF</u>
### (Against All Defendants)

195.    Helium realleges and incorporates the preceding paragraphs as if set forth fully herein, to the extent not inconsistent herewith.

196.    As set forth herein, Defendants' misappropriation of Helium's trade secrets and wrongful conduct violate Washington and federal law have and will continue to cause Helium irreparable harm for which there is no monetary remedy.

197.    Accordingly, Helium is entitled to a injunctive relief to stop Defendants' unfair competition, Defendants' misappropriation, and further irreparable injury to Helium.

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 36
No.

1

## V.    JURY DEMAND

2     Helium demands a trial by jury on all issues so triable.

## VI.    PRAYER FOR RELIEF

4     **WHEREFORE**, Helium Financial Group, LLC and Helium Advisors, LLC d/b/a Helium

5     Advisors respectfully requests this Court to:

6          A.     Enter a permanent injunction, ordering Defendants to:

7                 (i)     Cease and desist from acting in concert with, engaging in, tolerating

8     willfully, acquiescing in, or accepting Weeramantry and Amini's misappropriation of Helium's

9     trade secrets;

10                (ii)    Cease and desist from directly or indirectly using or disclosing Helium's

11    confidential and proprietary trade secret information;

12                (iii)   Forfeit to Helium all profits or other monetary benefits it obtained from the

13    use of Helium's confidential and proprietary trade secret information.

14         B.     Grant injunctive relief ordering Defendants to:

15                (i)     Return to Helium any and all of Helium's property in physical form or hard

16    copy in the possession, custody, or control of Defendants, including but not limited to, confidential

17    client or vendor information and trade secrets;

18                (ii)    Preserve and quarantine any and all of Helium's property in electronic form

19    in the possession, custody, or control of Defendants including but not limited to, confidential client

20    and vendor information and trade secrets;

21                (iii)   Preserve and quarantine any and all electronically stored information

22    potentially relevant in any way to the claims raised in Helium's Complaint, including but not limited

23    to, data, files, Dropbox files, email messages, and text messages;

24                (iv)    Identify any of Helium's confidential and proprietary trade secret

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 37
No.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

information that has been disclosed by anyone and the names of any individual to whom such disclosure was made.

     C.     Enter a judgment against Defendants and in favor of Helium on all Counts;

     D.     Award Helium money damages in an amount to be determined at trial;

     E.     Award Helium its costs and reasonable attorney's fees; and

     F.     Award such other and further relief as the Court may find just and proper under the circumstances.

DATED this 4th day of November, 2025.

*s/ Steven W. Fogg*
Steven W. Fogg, WSBA No. 23528

*s/ Todd T. Williams*
Todd T. Williams, WSBA No. 45032

Steven W. Fogg, WSBA No. 23528
Todd T. Williams, WSBA No. 45032
CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Ph: (206) 625-8600 | Fax: (206) 625-0900
sfogg@corrcronin.com
twilliams@corrcronin.com

James S. Rollins (*pro hac vice forthcoming*)
P. John Veysey (*pro hac vice forthcoming*)
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Ph: (617) 217-4700| Fax: (617) 542-2241
James.Rollins@nelsonmullins.com
john.veysey@nelsonmullins.com

Patrice M. Kreider-Hughes (*pro hac vice forthcoming*)
KREIDER HUGHES LAW, PLLC
4500 9th Avenue NE, Suite 300
Seattle, WA 98105
Ph: (206) 457-2610| Fax: (206) 472-6010
patrice@kreiderhugheslaw.com
*Attorneys for Plaintiff*

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF – Page 38
No.